**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
YVON CARRIER,                  :
                               :
      Plaintiff,               :
                               :
v.                             :    Civil No. 3:03cv1221 (JBA)
                               :
CITIBANK (SOUTH DAKOTA),       :
N.A., and CITIGROUP, INC.      :
                               :
      Defendants.              :
```

**RULING ON DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT [DOC. # 36]**

Plaintiff Yvon Carrier brought a six-count complaint in Connecticut Superior Court against defendants Citibank and Citigroup, alleging breach of contract, negligence, breach of the implied covenant of good faith and fair dealing, fraudulent misrepresentation, negligent misrepresentation, and violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a et seq.  Defendants removed the action to federal court on the basis of diversity of citizenship, pursuant to 28 U.S.C. §§ 1441 and 1446.  See Notice of Removal [Doc. # 1]. Currently before the Court is defendants' motion for summary judgment [Doc. # 36] on all claims.  For the reasons that follow, defendants' motion will be granted.

**I.   FACTUAL BACKGROUND**

The material facts of this case are essentially undisputed. Plaintiff Yvon Carrier works as a general contractor through his family-owned businesses, Carrier Enterprises, Inc., and The

1

Carriers, LLC.  Carrier's wife, Micheline, his daughter Christina and son Charles are co-owners who hold various positions in the family businesses.

In May 1999, Yvon Carrier hired Tammy Casciano as the secretary and office manager for the companies; she was the sole office employee.  Prior to hiring Casciano, Yvon Carrier became aware that Casciano previously had been convicted and served a prison term for stealing money from her former employer.  Because of her criminal background, Charles Carrier urged his father not to hire Casciano.  Nonetheless, Yvon Carrier hired her and assigned her to keep the books for both family companies.  While she was not given authority to sign company checks, she prepared checks for either Yvon or Christina Carrier to sign.  Casciano also was responsible for filling secretarial functions, opening the mail, doing the filing, and presenting invoices to be approved for payment.

For approximately 30 years, Yvon Carrier has had an active credit card account with Citibank that he uses for both business and personal expenses.  During the course of her work at the Carrier companies, Casciano obtained access to Carrier's Citibank card information.  Between August 2000 and January 2001, she made personal purchases using Carrier's Citibank card number.  In January 2001, Casciano obtained a secondary card on the account, issued in the name of Christina Carrier, and established a

personal identification number (PIN) for that card.  Casciano also changed the telephone number on the account from the Carriers' home phone to the office phone number.

Between August 2000 and September 2002, Casciano incurred $120,520 in charges on the Citibank credit card for goods purchased and cash advances obtained through ATM machines.  These charges were paid regularly using checks issued on bank accounts of either Carrier Enterprises, Inc. or The Carriers, LLC. Specifically, 25 checks, totaling $139,349.80, were paid by Carrier Enterprises, and Yvon Carrier stated that he signed 24 of those 25 checks.  Six checks were issued by The Carriers, totaling $36,025.33, and Christina Carrier stated that she signed three of those checks.

Casciano obtained Yvon Carrier's signature on certain of the large checks to Citibank by presenting him with a blank check, often catching him on his way out of the office and claiming she needed a signature right away even though she had not had time to fill out the payee and the amount of the check.  Carrier would sign the blank check, and Casciano subsequently would fill in Citibank as the payee.  For some of the smaller amounts, Casciano would fill out the checks with certain invoices or charge slips, and Carrier signed them on Casciano's representation that they were being used to pay his personal credit card bill.  It was not his usual practice to review the bills attached to the checks

that were presented for his signature, although he stated that he tried to make his staff believe that he reviewed all of the paperwork.

Carrier testified that Citibank mailed statements on his account monthly, but he would only review the statements if they were placed on his desk.  Casciano never placed any statements on his desk during the time she was using his credit card account. Carrier testified that he never asked Casciano or Citibank where the statements were.

Carrier also testified that each of the banks at which his businesses held checking accounts sent monthly statements, including copies of cancelled checks.  During the period 2000-2002, Yvon Carrier reviewed the bank statements for Carrier Enterprises, and Christina Carrier reviewed the bank statements for The Carriers, LLC.  Yvon Carrier testified that he reviewed the cancelled checks, but did not compare the checks to the bank statements or the bank statements to the business's payment records.  He testified that Casciano was responsible for this task, and suggested that Casciano had removed some of the cancelled checks to Citibank before giving him the bank statements to review.

During 2001 and 2002, Citibank monitored Carrier's account for potentially fraudulent activity.  Citibank has presented evidence that numerous times between January 31, 2001 and July

4

22, 2002,[1] Citibank blocked transactions, particularly cash advances.  See Breeden Aff. ¶¶ 9-19.  Each time, a person who was able to answer security questions –- such as mother's maiden name, social security number, date of birth -- and pass verification as the card holder called Citibank to request that the transaction be approved.  On September 14, 2001, an individual who passed the security verification contacted Citibank and requested that Citibank stop declining cash advances to a "daughter," but Citibank informed the individual that it would continue to decline transactions that were flagged by its warning system.  Pl. Opp. at Tab 3.  On December 5, 2001 and July 11, 2002 Citibank sent letters to the office address listed on the account seeking confirmation that two separate cash transactions were legitimate, and a person who passed the security test as the primary cardholder called Citibank to verify the transactions.  Plaintiff argues that the individual who passed the security test could not, in fact, have been the primary cardholder on the account, Yvon Carrier, because Yvon Carrier is male while the individual who called Citibank on each occasion presumably was a female, Tammy Casciano. It is undisputed that Citibank does not identify whether a cardholder

---

[1]Tammy Casciano is alleged to have begun unauthorized use of the Carriers' account in August 2000, but Citibank has not presented evidence that any fraud detection flags were raised on this account between August 2000 and January 2001.

is male or female on the computerized information screen available to its customer service representatives.

The Carrier family was not aware of any of these communications from Citibank or Casciano's financial transactions until September 2002.  One day when Casciano was out of the office, Christina Carrier opened a Citibank bill and noticed "a lot" of cash withdrawals on the statement.  Christina Carrier Dep. at 25.  Christina and Yvon Carrier suspected Casciano was responsible for these transactions and they searched her desk, where they found a file containing information relating to Yvon Carrier's Citibank credit card account.  They also found the Citibank statements that Casciano had not given Carrier to review.  After discovering these statements, Yvon Carrier testified that it was "very, very obvious" which charges were his business or personal expenses and which were Casciano's charges. Yvon Carrier Dep. at 98.

The Carriers immediately reported Casciano to the police. She was arrested, convicted, and sentenced to fifteen years in prison suspended after five years.

Yvon Carrier also reported the situation to Citibank.  In February 2003, Citibank gave Carrier a provisional credit for each disputed charge, designating those charges as "Security Credit - Item Under Investigation."  Compl. [Doc. #1] Ex. 3.  The conditional credits totaled approximately $116,000.  There was

also a full credit issued in the amount of $79.99.

On May 21, 2003, Jeffrey D. Gednalske, Vice President and Associate General Counsel of Citibank, sent a letter to plaintiff's attorney advising that Citibank would reverse the conditional credits.  The reason given was that:

> [T]he checks tendered as payment toward balances due on the Account were signed by an authorized representative of Carrier Enterprises, Inc.  It appears to me that the checks were signed either by Christina Carrier ... Yvon Carrier, or his wife, Micheline Carrier.  My review of the checks also indicates that the checks were made payable to Citibank (or some appropriate derivative name used by Citibank).  Also, there does not appear to be any modifications or alterations to the face of the check.
> ...
>
> Based upon my review of the file, I maintain that Citibank is a holder in due course and is not required to remit any funds paid to it by the checks in question.

Compl. Ex. 4.  Citibank did credit Carrier's account for certain contested charges that Carrier had not yet paid, in the amount of approximately $4,100.  Id.  The decision to deny the bulk of Carrier's claim ultimately was made by John Stavig, Citibank's Vice President of Fraud Policy.

Since at least 1999, Citibank has had a policy of "$0 liability for unauthorized use."  Def. L.R. 56(a)1 Stmt. at ¶ 2. This policy is widely advertised in print, television and other media, including Citibank's website.  See Pl. L.R. 56(a)2 Stmt. at Tabs 4-5.

Carrier contends that Citibank has violated its own policy, and thus its contract with Carrier, by failing to credit his

account for Casciano's charges.  At its core, plaintiff's argument is that Casciano's charges must have been "unauthorized" under the Citibank policy because they were illegal, as evidenced by Casciano's conviction and prison sentence.  See Pl. L.R. 56(a)2 Stmt. at ¶ 3.  Plaintiff further contends that the advertised "$0 liability" policy amounts to a representation that Citibank's fraud detection surpasses the industry standard, and that such representation is false and misleading because Citibank adheres to but does not exceed the industry standard, and because the existence of the policy suggests that cardholders do not have to review their monthly charge statements.  Plaintiff additionally argues that Citibank was negligent because it was unable to distinguish between Casciano, a female, and Carrier, a male, in verifying Casiano's status as a cardholder.  Defendant has moved for summary judgment on all claims, primarily arguing that by regularly and continuously paying Citibank with checks from Carrier Enterprises or The Carriers, LLC, signed by Yvon, Christina or Micheline Carrier, plaintiff created apparent authority in Casciano to incur charges on the Carrier account and therefore her charges were not "unauthorized."

## II.  STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . . show that there is no genuine

issue as to any material fact and that the moving party is
entitled to a judgment as a matter of law." Fed. R. Civ. P.
56(c).  A party seeking summary judgment "bears the burden of
establishing that no genuine issue of material fact exists and
that the undisputed facts establish [its] right to judgment as a
matter of law." Rodriguez v. City of New York, 72 F.3d 1051,
1060-1061 (2d Cir. 1995) (citing Adickes v. S.H. Kress & Co., 398
U.S. 144, 157 (1970)).  "The duty of the court is to determine
whether there are issues to be tried; in making that
determination, the court is to draw all factual inferences in
favor of the party against whom summary judgment is sought,
viewing the factual assertions in materials such as affidavits,
exhibits, and depositions in the light most favorable to the
party opposing the motion." Id. (citations omitted).  "If
reasonable minds could differ as to the import of the evidence
... and if there is any evidence in the record from any source
from which a reasonable inference in the nonmoving party's favor
may be drawn, the moving party simply cannot obtain [] summary
judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d
Cir. 1997) (internal citations, alterations and quotations
omitted).

## III. DISCUSSION

### A.   Apparent Authority

Defendants argue, and the Court agrees, that the present

case is controlled by Minskoff v. American Express, 98 F.3d 703
(2d Cir. 1996), which held that the plaintiff, a real estate
holding and management firm, was not entitled to recoup
approximately $276,000 in personal charges that were made by an
employee (Blumenfeld) who wrongfully obtained access to and used
a corporate American Express charge account, but which charges
were paid by checks drawn on the corporate checking account.
Minskoff hired Blumenfeld as a secretary/office manager to screen
mail, review vendor invoices and credit card statements, and
forward invoices and statements to the bookkeeper for payment.
Minskoff, 98 F.3d at 706.  Before hiring Blumenfeld, Minskoff had
reviewed personally all American Express statements, but after
hiring her, "he no longer reviewed any of these statements."
Id.  About six months after she was hired, Blumenfeld
surreptitiously applied for an additional corporate credit card
in her own name.  Over the course of the next year, she charged
about $28,000 on that card.  "During this period, American
Express sent ... monthly billing statements for the Corporate
Account to [plaintiff's] business address.  Each statement listed
both Blumenfeld and Minskoff as cardholders on the Corporate
Account, and separately itemized Corporate Account charges for
Minskoff and Blumenfeld."  Id.  These statements were paid using
checks drawn on the corporation's checking account.  Id.  Then
American Express sent Minskoff an invitation to apply for a

10

platinum card.  Unbeknownst to Minskoff, Blumenfeld filled out
the application and received platinum cards in her own name and
Minskoff's, and charged approximately $300,000 on the card issued
in her name.  Id. at 707.  American Express sent sixteen monthly
billing statements listing both Blumenfeld and Minskoff as
platinum cardholders and separately enumerating their charges.
Id.  These statements were paid by company checks.  Eventually,
the company's bank questioned one check, which led to an internal
investigation and Blumenthal's confession that she had forged
checks to pay American Express.  Id.

Minskoff then sued American Express for return of money that
had been paid for Blumenfeld's charges, arguing that under the
federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq.,
his liability was limited to $50 in case of "unauthorized use" of
the credit card.[2]  Id. at 708 (citing 15 U.S.C. § 1643(a)(1)(B)).
The Second Circuit rejected plaintiff's claim, reasoning that by
negligently failing to examine his American Express and checking
account statements over a period of a year and a half, Minskoff
"created apparent authority for Blumenfeld's continuing use of
the cards, especially because [plaintiff] enabled Blumenfeld to
pay all of the American Express statements with forged checks,

---

[2]"The term 'unauthorized use,' ... means a use of a credit
card by a person other than the cardholder who does not have
actual, implied, or apparent authority for such use and from
which the cardholder receives no benefit."  15 U.S.C. § 1602(o).

thereby fortifying American Express' continuing impression that nothing was amiss ... ." Id. at 710.

Although the suit was brought under TILA, the Second Circuit applied the common law of agency in defining "unauthorized use" under the statute.  Id. at 708 ("Congress apparently contemplated, and courts have accepted, primary reliance on background principles of agency law") (quoting Towers World Airways v. PHH Aviation Sys., 933 F.2d 174, 176-77 (2d Cir.), cert. denied, 502 U.S. 823 (1991)).  Under common law, apparent authority -- as distinguished from actual express or actual implied authority -- "arises from the 'written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf by the person purporting to act for him.'"  Minskoff, 98 F.3d at 708 (quoting Restatement (Second) of Agency, § 8 cmt. a).  The court held that while Blumenfeld did not have apparent authority to acquire the American Express cards, at some point "the negligent acts or omissions of a cardholder may create apparent authority to use the card in a person who obtained the card through theft or fraud."  Id. at 709.  Therefore, "once a cardholder receives a statement that reasonably puts him on notice that one or more fraudulent charges have been made, he cannot thereafter claim lack of knowledge."  Id. at 710.

The facts of the present case present an even stronger case for apparent authority than in _Minskoff_ because the checks used to pay Citibank were signed by the Carriers; they were not forgeries.  It is undisputed that Tammy Casicano at first gained access to Carrier's Citibank credit card information, and obtained a card in her own name, without Carrier's knowledge or permission.  However, Yvon, Christina and Micheline Carrier signed legitimate company checks, some blank and some made out to Citibank but unattached to full Citibank invoices, which Casciano used to perpetrate her theft.  From Citibank's perspective, nothing had changed from the previous 30 years during which Yvon Carrier held the Citibank account, because checks from Carrier Enterprises or The Carriers, LLC, signed by members of the Carrier family, continued to be received as payment in full for the Citibank credit card invoices, and no cardholder complained to Citibank until September 2002 that any charges were fraudulent.  Furthermore, Citibank's fraud detection system did raise warning flags for many transactions after January 2001, and each time, Citibank was reassured by someone who passed the security test as the cardholder that the charges and cash withdrawals were legitimate.  Plaintiff concedes that Citibank met the industry standard for fraud detection.  Thus, having investigated under industry standards whether these transactions were legitimate, Citibank reasonably relied on the

13

representations of the individual it believed to be Christina
Carrier that the cardholder consented to these transactions, a
belief which was strengthened by subsequent payments of the
charges.

The outcome of this motion does not turn on Yvon Carrier's
failure to review his bank account or credit card statements,
which arguably could in some circumstances be justifiable as a
small company's delegation of its bookkeeping function to an
employee.  Nor does the outcome turn on Yvon Carrier's unwise
decision to hire a known embezzler as a bookkeeper and then fail
to supervise her.  Here, the fact that Carrier and members of his
family signed checks from their business accounts in payment for
their business and personal expenses, as well as Casciano's
charges to Citibank, created apparent authority for Casciano to
incur these charges.  In other words, by paying the Citibank
bills without contesting any of the charges, over a period of
approximately two years, the Carriers created apparent authority
in Casciano to incur these charges.  Citibank also received
assurances from someone passing the test as an authorized
cardholder that many of the flagged transactions were authorized.
Having received checks legitimately signed by the cardholder or
his family in payment for Casciano's charges, and having received
further verbal assurances over the phone that the cash
withdrawals were authorized, Citibank reasonably believed that

14

the plaintiff consented to these charges.  Minskoff, 98 F.3d at
710; see also DBI Architects, P.C. v. American Express, 388 F.3d
886, 893 (D.C. Cir. 2004) (where employee obtained office credit
card in her own name without permission and incurred personal
charges, plaintiff who sought return of payments to American
Express could not "avoid liability ... because its repeated
payments in full [over ten months] after notice led AMEX
reasonably to believe that [defendant] had the authority to use
[plaintiff's] corporate credit card.").

Carrier's argument that Casciano's charges obviously were
"unauthorized" because they were criminal is unavailing because
"illegal" is different from "unauthorized."  Apparent authority
is created by the actions of the principal -- here, Yvon Carrier
-- and the reasonable perceptions of a third party -- here,
Citibank.  Citibank does not dispute that Casciano's initial
access to Carrier's credit card was unauthorized, or that her
conduct constituted criminal theft.  Rather, the issue is whether
Carrier's payment on the account through company checks, without
challenging any of the charges, estops him from denying
Casciano's apparent authority to incur these charges.  Based on
the undisputed factual record, Yvon Carrier's actions created the
appearance to Citibank that Casciano's purchases and cash
withdrawals were authorized.

15

**B.    Breach of Contract**

Plaintiff's breach of contract claim (First Count) asserts that Citibank violated its promise, embodied in the cardholder agreement and its "$0 liability policy," that Citibank cardholders will not be held responsible for any "unauthorized purchased and/or charges."  Compl. First Count, ¶ 17.  This claim is premised on the argument that all of Casciano's charges were "unauthorized."  As the undisputed evidence shows, Casciano had apparent authority to incur the challenged Citibank charges. Therefore plaintiff's breach of contract claim must fail.

**C.    Negligence**

The second count of the complaint asserts that Citibank was negligent for failing to detect Casciano's fraud.  Specifically, plaintiff alleges that Citibank's was negligent by:

   a.   Not adequately reviewing the signatures associated with the charges/purchases to ensure that such charges/purchases were in fact authorized.

   b.   Making the decision the checks used to pay for such purchases/charges were signed by an authorized representative based on a lay person rather than a handwriting expert...

   c.   In making the decision to not honor its obligation to hold Carrier $0 Liable," Citibank did not review any of the charges or purchases.

   d.   Not implementing procedures whereby Citibank could verify whether or not charges/purchases are authorized.

Compl. Second Count ¶ 17.

Plaintiff asserts that Citibank's "$0 liability" advertising

"has invited card holders to disregard their monthly notices,"
and therefore "Citibank has a duty to verify who is using the
cards they have issued."  Pl. Mem. of Law in Opp. [Doc. # 41] at
10.  Contrary to plaintiff's argument, Citibank's promise of "$0
liability for unauthorized purchases" cannot reasonably be read
as an invitation for a customer never to review (or have
reviewed) his or her credit card statements in any manner for a
period of two years.  While plaintiff admits that Citibank has
"adhered to the industry standard" for detecting and deterring
fraud, Pl. L.R. 56(a)2 Stmt. ¶¶ 8-9, plaintiff claims that
defendant's advertising represented that defendant would do more
than this.  Citibank flagged and followed up on numerous
suspicious transactions on Yvon Carrier's account, and plaintiff
offers no evidence of Citibank's negligence other than the fact
that defendant failed to detect Casciano's larceny.  Plaintiff
argues that Citibank should have discovered that the primary
cardholder was male, while the person representing herself as the
cardholder (Casciano) was female, but plaintiff gives no evidence
of how defendant should have known of this gender distinction.

For these reasons, no dispute of material fact concerning
the negligence claim remains, and defendants are entitled to
judgment as a matter of law on this claim.

    **C.   Bad Faith**

Count Three of the complaint alleges that Citibank breached

the duty of good faith and fair dealing in entering the cardholder agreement with Carrier.  The allegations in this count are identical to the allegations in the previous negligence claim.

> To constitute a breach of the implied covenant of good faith and fair dealing, the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith. Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.... <u>Bad faith means more than mere negligence</u>; it involves a dishonest purpose.

<u>De La Concha of Hartford, Inc., v. Aetna Life Ins. Co.</u>, 849 A.2d 382, 388 (Conn. 2004) (internal citations and quotation marks omitted).

Plaintiff argues that Citibank's policy of giving financial incentives to its fraud investigators -- by tying their salaries to their ability to contain the fraudulent losses sustained by Citibank -- evidences bad faith.  Plaintiff also argues that Citibank acted in bad faith in giving notice to Casciano's prosecutor of the amount of loss involved without explaining that plaintiff, not defendant, was bearing the loss.  Neither allegation is contained in Count Three of the complaint, and on its face, Count Three is identical to the negligence claim in Count Two.  Because a breach of the implied covenant of good faith and fair dealing "means more than mere negligence," <u>De La</u>

Concha, 849 A.2d at 388, and because plaintiff's evidence falls short of showing "dishonest purpose" in any way, Count Three of plaintiff's complaint fails as a matter of law.

### D.   Misrepresentation

Counts Four and Five of the complaint allege fraudulent and negligent misrepresentation, respectively.  In support of these claims, plaintiff again challenges as misleading Citibank's advertisements for its "$0 liability" policy, stating that "the false representations consisted of false claims that the Defendants could detect and stop unauthorized use of the card holder's account."  Pl. Mem. of Law in Opp. at 12.  Plaintiff further argues that "[f]rom [Citibank's] advertising, it appears that a card holder need not review their [sic] monthly statement because the Defendants will detect the fraud and stop it."  Id. at 13.

Plaintiff would read Citibank's "$0 liability" policy as an unqualified promise that Citibank had a failproof security system that would detect and deter all fraud even in the absence of any action or notice by the plaintiff to Citibank that certain charges on a statement were not his.  This is an unreasonable interpretation of Citibank's advertisements.  Defendant's advertising could not lead a reasonable consumer to believe that he or she need take no steps to review his or her monthly credit card statements, while still paying the credit card bill in full

19

over a period of years, and expect Citibank to discover on its own that an employee had incurred charges on the account without cardholder permission.[3]  Plaintiff's interpretation flies in the face of basic personal and business financial prudence: to review one's credit card bill before paying it.

Plaintiff also challenges Citibank's grant of "conditional" credits on the contested charges while they were under investigation, and a notation on the same Citibank statement dated February 7, 2003, that "this dispute has been resolved in your favor."  Compl. Ex. 3.  In the context of the February 7 document, no reasonable person could find such notations misleading.  All of the charges, save one, contain the notation "SECURITY CREDIT - ITEM UNDER INVESTIGATION."  The status "under investigation" indicates that the credits are only conditional or provisional, i.e., until the investigation is complete, and does not mislead the cardholder into believing that the credits are final.  The notation at the end of the statement that "this dispute has been resolved in your favor" clearly pertains to one charge for $79.99 incurred on "12/10."  Id.  This charge is also separately listed on the fourth page of the statement as "CITIBANK CREDIT FOR DISPUTE -79.99," which is a different

---

[3]Plaintiff further argues that Citibank has "given their employees incentive to not honor the promises in their advertising," Pl. Mem. of Law in Opp. at 13, but plaintiff cites no evidence that this financial incentive policy affected Citibank's decision on his claim.

notation from the "security credit" notation on all the other contested charges.

Because these entries on the Citibank statement could not reasonably be found misleading, and because Citibank's "$0 liability" policy could not reasonably mislead a cardholder into believing he or she had no responsibility to review credit card statements before paying them, or had or to play no role whatsoever in fraud detection with respect to his or her own account, to obtain the benefit of the policy, defendants are entitled to summary judgment on Counts Four and Five of the complaint.

### E.    CUTPA

In the sixth count of the complaint, brought under CUTPA, Carrier asserts that Citibank committed a "deceptive practice" by advertising "that if someone is the victim of unauthorized charges, the Defendants will simply reimburse the victim."  Pl. Mem. of Law in Opp. at 15.  For the reasons discussed above, Citibank's "$0 liability" policy could not reasonably be interpreted as such a broad indemnity policy, nor has plaintiff presented any evidence that Citibank's practices or advertisements are deceptive or oppressive to consumers generally.  Therefore defendants are entitled to judgment as a matter of law on the CUTPA claim.

21

**IV.   CONCLUSION**

Accordingly, defendants' motion for summary judgment [Doc. #36] is GRANTED.  The Clerk is directed to close this case.

IT IS SO ORDERED.


_____/s/_____
JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, August 18, 2005.**

22